Here is the State of John Oliva. Good morning, Your Honors. Good morning. My name is William H. Buckman. I'm the plaintiff's attorney. I would like to reserve three minutes for rebuttal. Okay. Assuming that is necessary, I'm not afraid of saying that. You're not afraid of saying what, sir? I'm not afraid to say I waive that. Okay. You've been around for a while, Mr. Buckman. Thank you. I, this, with respect to John Oliva's case, as I re-read the briefs and re-read the opinion on the way, or not on the way, but in preparation for this case, it occurred to me that the central core or that the court below seemed to adopt was that there had to be direct evidence, as opposed to circumstantial evidence, of what happened to John Oliva. And what happened to John Oliva was an elongated pattern of retaliation of, should we say, off-the-books punishment, code of silence punishment for having complained about racial profile. The court below, for instance, made the determination that the assertions of Colonel Dunbar were appropriate, yet the assertions of Colonel Dunbar are, were enduring deposition where he admitted that as the superintendent of a 2,700-person state police agency, he took personal interest in this case. He was personally involved and personally nixed the transfer of John Oliva to a more appropriate and perhaps safer assignment is something that the court below ignored. But wasn't the reason for the, and there are a couple of different transfers, and I may have the wrong one, but there was one where the transfer of Oliva resulted in him going to a different barrack, same troop, a little bit further than his current one, but in order to, in doing that, he was able to facilitate a much more substantial move for another trooper who had moved, I think, 50 or 60 miles. So that he was basically, I mean, that Dunbar had this entire police force, if you will, to deal with, and so he apparently, it looks like, and it's uncontested on the record that I can see, uncontradicted, he allowed for Oliva to be transferred with a small bit of additional journey, I think four or five miles, in order to facilitate the transfer of another trooper and save that trooper a much greater commute. Is there anything to undermine that explanation? Yeah, absolutely. At the same time, concurrent with the Oliva transfer to Tuckerdin, one of the commands, Colonel Dunbar overruled one of his own command staff that said we should probably, for safety, get this man out of Troop A. Out of Troop A and into Troop B. And into Troop B. But he didn't want to start that kind of precedent. He didn't want to start that kind of precedent, he said. But we have the testimony of the command staff person, Major Brennan, who said that I thought it was necessary for his safety. And the question is, do we credit without question Dunbar's assertion, or is that a fact for the jury to find? We also have the concurrent case, which we included in our briefs below and recited in our briefs here, of the investigation of the Lords of Discipline, a secret organization, a semi-secret organization in the State Police that meets out sort of off-the-books discipline, which was going on at the same time. And lo and behold, it turns out that Tuckerdin Barracks is the epicenter of the LOD. And not only is it the epicenter of the LOD, but Oliva is sent to be under the command of the very sergeant who is associated most with the LOD, who admits ultimately that he was in the LOD, or at least is disciplined for the LOD, and has an LOD T-shirt. Now, that coupled with the fact that at least some persons in the command staff would have said, we've got to get this man safe, we've got to get this man out of Troop A. How many people said that? I mean, where does that come from? That came from Major Brennan. How many people said it? We don't know. Certainly John Oliva did not want to be in Troop A anymore. And certainly John Oliva asked to be out of Troop A. And maybe there was a necessity, maybe there is this rationalization that we have to save somebody else 15 miles. But at this point, Oliva had been harassed for a year, a year and a half, two years. Well, how much, in the immediate record, it seems that the notes especially, and I know that it may well be that there's enough there to give rise to an issue of fact, but it seemed that a lot of the harassment came because he was not willing to play by the rules, not necessarily in terms of the racial profiling, but getting there early and basically doing rookie work, preparing the coffee, cleaning up. Apparently there was this custom that the new recruits would come in and do what might be termed rookie work, because that phrase that are hazing kinds of activities, where they go and prepare coffee, clean up wastebaskets, do the junk work. And he being a former Marine and given the expertise he had with hand-to-hand combat and the martial arts, didn't want any part of that. And there was some retaliation because of that. Am I misreading that or is that contradictive? Well, you're not misreading it, that the defendants offered that as a proposition. But in terms of the evidence and in terms of the potential inferences to give to John Oliva is the fact that he did participate in that sort of conduct and that he was a highly qualified officer, that he was able to stand up to hazing. He had been a Marine, a corrections officer. Some of these incidents were really, he almost comes across to me as an eggshell plaintiff. You know, a former Marine, a law enforcement officer in various police departments, very highly regarded. You know, he was very, he didn't take it. They didn't seem of, you know, an anonymous note. These are not, I don't know, maybe I'm thinking a lot. I don't know where I'm going. Well, I guess we can call him an eggshell plaintiff. But I don't think that what was presented below necessarily showed that John Oliva was of a weak mental state. As a matter of fact, he had been asked to train the state police in martial arts before he was even a member of the state police. He was perhaps the highest ranker. He did it in November 1998. He joined the state police. And by the end of the year, he had complained about what Gallagher was making him do. And it was two years later, he had killed himself. That's correct. So, I mean, that's very, I wouldn't be so quick to say he had no mental problems. I mean, something developed. If it started in November, it developed very quickly. And I'm wondering about these incidents were not major. They did not appear to be major. Well, first of all, under, for instance, New Jersey CEPA law, a number of minor incidents can be culminated to become a law, the type of cause of action which Oliva alleged. But more importantly, I would suggest that that is an issue of fact for the jury because it says how a man who is highly disciplined, who was a Marine's Marine, ends up dead in two years when he is subjected to the full brunt of a juggernaut that does not like the fact that he's complaining about what Gallagher did. It's certainly a permissible inference. It certainly is a permissible inference that whatever he had said to Sergeant Gradilla got around and there was, there was. Yes. But one of the things that is so difficult for you here is that you can't really pin it on any defendant, you know. Well, yes. And Judge Irenas went through this with excruciating care. I know what you're saying about direct evidence. Yes. But it's hard to pin anything that happened on specific defendants. You know, kind of everyone was doing it. But that's not, is that enough? Well, I think what was painted below was a mosaic, a set of inferences, a mosaic. There were some smoking guns. But I'll be the first to admit that there was a mosaic, but it was up for the jury to determine and to stand back and see if that mosaic. But who do they find? Who's the one that they're going to find in your favor against? Well, Dunbar, for instance, refusing to get him to safety. Are you pressing your claims against Dunbar on appeal? I'm sorry? Are you pressing your claim? No. I think the strongest claim is that against Armitage, who totally distorted an investigative process to turn John Oliva into a principal in an investigation. What is there, though, to negate Armitage's reason for why she turned him, how that came about, that he was a principal? They apparently were not going to do that until after some disturbing things came to light about what he was saying and the accusations he was making. They decided, okay, well, let's find out what's going on here. A random sampling is conducted. When the random sampling is conducted, it looks like he's engaging in the same kind of illegal conduct that he's accusing others of and that he's saying got him into all this trouble because he refused to go along with it. They then want to hear his side of it. He doesn't come in, and let me know if I'm mixing my facts here, which is very possible. Certainly. He doesn't come in, and at some point they decide, well, since we've got people who have taken a polygraph and shown no deception saying that he was the one involved in conduct which he has himself admitted was illegal, he then becomes the principal. How does that get you where you need to be under his statutes? When we go through the depositions, again, I hardly agree that that was a random sample. I think that that was a result-oriented sample. There was nothing random about it. Ultimately, they contacted ten motorists. Only four showed up. Only two would take polygraphs. Well, but the four and the two, that's not there. The ten you can focus in on, but the four and the two, that's beyond the defendant's control. They can't control who shows up. Well, I agree, but I would hardly say that that's random sampling, but then again... What was the universe? Do you know how many people they had where both of these officers had been involved in the trial? I may be confabulating, but I seem to remember the number of 50. I seem to remember the number of 50. If you have a universe of 50, if N equals 50, and you're trying to get a representative sample, one-fifth of 50, and it seems to me that's, I don't know, PhD in statistics, that's for sure. That does seem to be, for statistical sampling purposes, an adequate-sized sample. You're saying the size wasn't adequate to get a reliable result, but if it's one out of every five, it seems to me that is an adequate sampling. Absolutely. I would beg to disagree, but only two took polygraphs, and then again, we don't know what they're polygraphed on. I mean, someone could thoroughly believe what they're saying at the time of the polygraph. But this is where the problems come in. But it doesn't mean that they're truthful. But you're looking at every, when you're looking at the Armitage camera investigation, you're viewing it under the most intense microscope, and we're looking for anything that could have happened or should have happened, and everything that was done, what they should have done, what they shouldn't have done. There has to be something on the record. But there's nothing, this is all just speculation in terms of, all right, sure, in the ideal world, you'd get the polygraph examiner in, you'd view deposal and what questions were asked and what the background. But, you know, you've got a burden here, and I just don't see how this takes you toward the goal line. Well, I would, again, I would disagree. In particular, for instance, I would point to the testimony of former Superintendent Santiago, who said that this organization had a culture of retaliation, that he was tasked with trying to root out retaliation in this organization. This organization was eating its own, that he felt that what had been done to John Oliva perhaps contributed to his own suicide. When you say this organization, you mean the state police? Yes, sir. You mean the Lords of Discipline? No, the state police. Did Judge Arenas, look, I live in New Jersey, so I read the papers, did Judge Arenas ever hold that there was a Lord of Discipline, that the existence of that group was a disputed matter? Well, it was, and again... He said there was no formal organization, correct? That's correct, no formal organization. He didn't say there wasn't an informal organization. So he, in effect, said it existed, doesn't have bylaws. It certainly doesn't have bylaws. Not written down, anyhow. I'm sorry? Not written down, anyhow. Not written down, except on some T-shirts. I think we prove that in a companion case, that there was an actual discussion that another trooper, under the guise of the Lords of Discipline, and this trooper, quote-unquote, it was admitted something had to be done about him. Again, Sobolewski, the one that Oliva was tasked to be under. But to go back to Armitage, we have her investigating Oliva. She says that the polygraph said that they were truthful, but she doesn't know what they're truthful about. She gets a letter from the Attorney General's office saying there will be no criminal prosecution against Oliva or Gallagher. And we must note that Oliva was following the orders of Gallagher. Gallagher is told that he's not going to be a member, that he's not going to be criminally prosecuted. But Oliva is not told that he's not going to be criminally prosecuted. Then Oliva becomes a principal. Because the investigation into Oliva was still continuing. Right? Well, I couldn't say that that's the accurate reason. That's when he became a principal. He became a principal, but it's still, the letter still said that there wasn't going to be a criminal prosecution. And there certainly seems to be an inference of a studious refusal to tell him he's not going to be a victim of a criminal prosecution where ultimately only months later, even after the investigation was done, and he was supposed to have been interviewed during that investigation, there is a very tense accusatory interview of Oliva wherein it's even discussed about criminality. He's dead two weeks later. My red light is on, and I won't make Heiwa the sun shines. Thank you. Thank you. I think you guys have some time. Thank you. Mr. Chairman. Good afternoon, Your Honors. My name is Catherine Tamasic, and I'm here on behalf of all of the appellees. There are a number of issues I'd like to address here, many of which were raised in my colleague's argument. But I'd like to start by saying that although this case, from its outset, had a number of claims, a host of allegations, actions brought under various constitutional provisions and statutes, it boils down to this. It's a case about retaliation, and it's a case about whether there is evidence of retaliation. Obviously the standard to prove a retaliation case requires a plaintiff to show, as prima facie evidence, that there was protected conduct, that there was some adverse action taken against him, and that there's a nexus between those two. Now, Judge Irenas very correctly found that the one thing that was not established here was the nexus. In no event was the evidence sufficient to show, to create, that is, even an issue that should be put to the jury, that there was any kind of retaliatory animus on the part of these defendants toward the plaintiff. Your Honor said a few minutes ago that Judge Irenas, I think she used the word meticulously, dissected each of the allegations and the evidence that supported it, and one by one had to refuse them because there just is no evidence. As to a specific defendant. But you put it all together, and I'm not sure. This is the smell test. Your Honor, it's not enough. Your Honor, we are not aware of any case under SEPA in New Jersey that allows a plaintiff to cite to a number of minor or even less than minor instances that culminate in some kind of adverse employment action. That's not the standard. That may be a hostile environment claim, but that's not what we're dealing with here. Judge Irenas, I'll note, didn't even deal with the hostile environment claim because this never was a hostile environment claim. It was retaliation. It was retaliation under Section 1981, and then it's retaliation under SEPA. The standard obviously is the same under both. Any hostile environment, what plaintiff always alleged here was that he was retaliated against. Now, if you break that down further, and looking at the big picture is not good enough because if you look at the big picture and you look at an organization the size and scope of the state police, which is to some extent almost a quasi-military organization. It's a law enforcement organization. And you've got rankings from colonel right down to the lowest new recruit troopers plus a host of civilians. If you look at this big picture and you say that this culture is infected with some kind of animus that is directed toward people like the plaintiff, well then couldn't anyone for any reason suggest that any wrong committed against them, as they saw it in the workplace, would be part of that culture? The law requires so much more than that. It needs particularity. It needs, as Judge Irene has correctly found, sufficient evidence so that a jury, a reasonable jury, could conclude that there's a connection. I'd like to say this about the negative performance evaluations from Sokari. There's no evidence, Your Honor, that those were not deserved. There were negative performance evaluation regarding an incomplete accident report. Trooper Lieber was required to produce an accident report. There's a time limit when you investigate an accident. You have to do the report in a certain number of hours or a certain number of days. He didn't do that. He was written up for that. There was another one for I believe he was allegedly sleeping on the job. He said that that wasn't so, but nonetheless there was a performance notice. And right off the bat now I'm not sure what that third one was. That was the one where they went to his home to interview him to get the copies of the anonymous notes and they tracked them down to the gym. That was later, Your Honor. That was in January of 2001. Judge McKee is referring to the 2000, October, September 2000. And there were three pretty close back-to-back. But, again, we're dealing with a trooper. He says it's because he wouldn't play ball in the profiling. They're saying, well, no, it's because his performance was deficient. Why isn't that an issue? A fact that jury could find, at least as to that one defendant, they're going to retaliate because he wouldn't play ball in the profiling. The key is this, Your Honor. There's no evidence that Sergeant Socorro had any knowledge that Oliva ever complained about racial profiling. Judge Irenas looked at all this very carefully. There's an alleged complaint in November of 1998 to Sergeant Gordillo, which Sergeant Gordillo says never happened. And there are two complaints in or about May of 2000 to Sergeant Waldron and Sergeant Callan. Sergeant Waldron was not dismissed on summary judgment because there was evidence, Judge Irenas said, there's at least enough of an inference here that Waldron gave Oliva a bad evaluation because of Oliva complaining to him, to Waldron, about profiling. Now, that part of the case went forward. Plaintiff dismissed Waldron from this action shortly after the opinion was issued. Was that so, or what happened? It was simply, to my recollection, plaintiff simply dismissed defendant Waldron. Well, let's go back. Yes. You have the abiding sense that something was going on here. You really do. I do. I do, too. Something was going on. I'm just wondering whether, if that's so, there should be a reward. Appellees should be rewarded for keeping it as subtle as it appears it was here. Your Honor, that's an interesting question. I wouldn't call it a reward. I would call it a... Because there have to be defendants who can be found liable for doing the types of things that are challenged in this complaint. There can't be an amorphous, you know, we all know it, but we can't pin it on anyone. It can't be that. But then, Your Honor, the first question that comes into my mind is then who is it? I mean, there is nothing, as you said earlier, too, there's nothing to pin on anyone in particular. There's nothing to show that any of these defendants early on, pre-January 23rd of 01, which, by the way, if you will allow me, that raises the whole question about Colonel Dunbar. The suggestion that he was retaliating against Oliva is, frankly, absurd. He had... There was no knowledge on Dunbar's part. There is nothing in the record that even suggests that Dunbar had any knowledge of Oliva complaining about profiling. I would find that hard to believe, given what was going on in the state of New Jersey at that time with reference to the investigation into racial profiling, the interim report, the final report, the consent order. I would think the superintendent of the New Jersey State Police would be informed any time anyone even mentioned the phrase racial profiling. But he didn't, because Oliva... There was nothing to show that Dunbar knew. Dunbar was responding to the Lords of Discipline allegations that Oliva made. He was responding to that. And as counsel correctly stated, he took Oliva out of this station, the Woodbine Station, where this Lords of Discipline activity was allegedly occurring and moved him out of that. To the habit of it, according to... Well, Your Honor, you know... I didn't mean to upset you with that, but that is your adversary's position. Yeah, and my adversary also refers to things that happened at that Tuckerton Station in 2002. Oliva was transferred there on January 4, 2001, and he never appeared there for work. I'd like to correct one thing, because this is important too. Oliva became a recruit in November of 98. He killed himself on October 1, 2002. Now, there's almost two years there, January of 01 till October of 02, where he's not in the State Police. He's home. He's home on sick leave. He has interaction, as I'm sure you'll hear in rebuttal. The investigation is continuing. He's named as a principal, etc., but he's not in the State Police environment. It does, as I read it, I really scratched my head. Someone, especially with the martial arts training that he has, how he could end up that tragically killing himself. It's so inconsistent with the level of discipline and control and relaxation he would have to have achieved to get to that level in the martial arts. I can't put that together in my own mind. For what it's worth, that doesn't really help us with this issue. Well, Your Honor, there's another thing here. This is somewhat like the case before us, a very tragic situation. This young man was 32 or 33 years old when he decided that his life was so terrible for whatever reasons that it wasn't worth living. His parents were devastated until this day they are. They were crushed by this. There's no doubt that this is a very, very sad and tragic situation. But there's nothing here that points to liability in the State Police. Maybe he was an eggshell plaintiff. Maybe he was what? Maybe he was an eggshell plaintiff. That's never been argued. It's not certainly been addressed in the briefs. But at this point, I would like to just also say that there's a lot of hearsay in the briefs. There's a lot of miscites to the record. A plaintiff talks about Superintendent Santiago, who succeeded Superintendent Dunbar, talking about the retaliation and the culture. If you look at the site, he's referring to when he was in Newark, when he was the chief of police in the city of Newark, not the State Police. Counsel deposed the polygrapher, the gentleman who took the polygraphs of the motorists. He did depose those. There was evidence produced. The record in this case is massive, and out of this it's boxes and boxes of documents and reports, about 20 depositions. And it all comes down to there just wasn't the evidence connecting these alleged wrongful acts to any defendant, and certainly the connection that Oliva, that they were based on complaints of racial profiling doesn't exist. Just one more thing. A plaintiff talks a lot in his reply brief about improper methods of investigating Oliva and the fact that he was charged with wrongdoing. Oliva was never charged. The record shows that he was never charged. In his September 2002 interview, the record also shows he was given the opportunity, and the whole purpose was to give him the opportunity to talk about the findings that the investigator got from the motorists. What's going on here? Can you explain this? What's happening? He did go to the interview, finally admitted that he had engaged in the very wrongful conduct he was allegedly complaining about in the first instance, but no charges were ever brought. That would have come later, as Major Brennan testified in his three days of deposition, and it just never got to that because unfortunately between that September 17th interview and obviously two weeks later Oliva was no longer with us. Thank you, Your Honors. Thank you. Thank you, Your Honors. The resignation, first of all, when we talk about Santiago and who are the people that are responsible in this case and we talk about the Armitage investigation, first of all the Armitage investigation was completed on August 30th of 2002. It was done. It was approved. And yet for some reason they called in John Oliva for this very contentious interview. When we talk about inferences and material or facts, material facts or facts that the jury can find, there is the absolute inconsistency between Cameron and her co-investigator, a ranking officer, excuse me, Armitage, and her co-investigator, a ranking officer, Cameron, where Cameron said that no one would finish their investigation without interviewing the principal. And then Armitage says, well, I didn't have to. I didn't have to interview him, but he wanted to be interviewed. But what is clear is that the investigation was over by the 30th and they sent him up there. We talk about Dunbar not knowing about John Oliva. We ignore the evidence of Haggerty, who was the press secretary for the state police, who testified that he saw Dunbar almost daily talk to him about these issues and commented to the press initially that there seems to be something to what John Oliva is saying. And he was talking to Dunbar almost daily,  as to what was written down when he met with Dunbar and who it was that told him that there was something to do with Oliva's complaints. The other aspect of the tragedy of Oliva is the fact that Santiago specifically said that he wanted a plea agreement to go out to Oliva. And when Oliva killed himself, he went nuts, essentially saying, why didn't that plea agreement go out to Oliva? And in his words, he said, all I got was a dance in the woods. He said that the plea agreement that was – It wasn't a plea agreement. The plea agreement was – It wasn't a plea agreement. I'm sorry? It wasn't an agreement to resign? It was an agreement to resign. Yeah. But Santiago said that was only the first step in the process. Depending on what he heard, he might very well have backed away from that. And he said specifically that if Oliva had heard that he would not – that there was something on the horizon for him, that he was concerned that Oliva wouldn't have killed him. I – killed himself, excuse me. I would – there was also the Santiago letter, where Santiago told Oliva months earlier, we're not going to re-up you. We're not going to let you stay in the state police because you don't have tenure, which supposedly was based on the fact that he abused sick leave, but he was approved for sick leave, which goes back to Dr. Izzi. There are so many aspects of this mosaic, and I would agree that it's an uphill battle. But when it all comes – when it is all said and done, there are a number of people to point to – Armitage, Cameron, Dunbar, and Santiago at the minimum. If not, for instance, Shire, who told Waldron. Waldron testified that Shire came down early on and said to him, my job is to see to it that this case is whitewashed. Thank you. Thank you. We'll take that under advisement. And again, thank counsel for the help and argument. Thank you.